Mr. Murray and Mr. Diaz back in conference. Thank you Drew. Case number 10-3922, Eric Carter et al. versus Welles-Bowen Realty Incorporated et al. Argument not to exceed 20 minutes to be shared by the plaintiff and intervener and 20 minutes for the defendants. Mr. Murray you may proceed for the appellant. Thank you, may I please the court I'd like to reserve two minutes for rebuttal. Congress unequivocally spelled out its intent and the purpose of 12 U.S.C. 2607 commonly referred to as RESPA. That purpose is to prevent unearned fees and kickbacks in a federally related mortgage transaction. Congress wanted to protect consumers from paying excessive fees at closing because referral based kickbacks were leading to inappropriate services. What Congress did not do was to spell out the specifics as to how to protect those consumers. Instead Congress as it often does deferred to an agency. Congress felt that that agency had the expertise in this case HUD to interpret the statute and carry out the statute's purposes. As specifically stated in 12 U.S.C. 2617A authorizing HUD to interpret the statute and proceed with rulings. Appellee's interpretation of 2607 flies in the face of the very purpose of that statute and that is protecting the consumer. Appellee's interpretation of 2607 led to unscrupulous entities setting up sham operations that performed little or no substantive work but collected massive bloated premiums for title insurance and closing costs thus frustrating the very purpose of RESPA in the first place. Appellee's position directly contradicts the HUD policy statement issued in 1996 which states that the exemption for referrals found in 2607C4 must be made by a provider of settlement services and I quote, these provisions do not authorize compensation to shell entities or sham arrangements what are not bona fide providers of settlement services. These sham entities that were identified in the public policy statement process were doing exactly what both Wellesbone Title and Integrity, the appellees here, are doing. That is doing almost no real title work, no real settlement work and collecting a lion's share of the insurance premium. Counsel, this is Judge Sutton. I'm just curious if you have a sense why with this statute and the safe harbor that was created, why HUD didn't promulgate notice and comment regulations as opposed to kind of going to this internal policy statement. Your Honor, I think the government would have to speak, would be better positioned to speak to that. One of the reasons I believe, though, is that they were unaware of the problem until the Mortgage Brokers Association filed a written complaint indicating that these sham organizations were a problem and that they were not providing real services but collecting funds as part of the insurance premiums and that I'm sorry. Well, to say, okay, well, let's let the government argue that. What happens if the policy statement is not binding on the courts? Just hypothetically, it's something to guide HUD, but it doesn't bind the courts for whatever reason. What then happens to your case given the existence of the statutory safe harbor? Well, I think it is at least Skidmore deferential and we were promoting or arguing that it is because we have a sham entity. I guess that's the question I'm trying to get you to answer. Let's take Chevron, Skidmore out of it for whatever reason. Just hypothetically, the court says the policy statement, these ten-factor test is for the agency to use, but it doesn't bind the courts and for Skidmore agencies, given the statutory safe harbor, is that the end of the case from your perspective or what would be your back-up argument? It is not. I think the court is then obliged to look at the statute in its entirety and its purpose and in doing so, it's clear that the Congress did not want entities collecting insurance premiums and closing costs that were not doing actual services. In other words, they didn't want kickbacks and the Congress spelled that out very clearly. So we come down to a question of fact as to whether or not these entities are in fact engaged in a sham or a bona fide work process. What HUD did is give us guidance, give all of the public guidance as to what is a sham and what is not. One of the primaries of the trial court is that the district court picked out certain phrases in a ten-page document. Picked out four or five phrases in a ten-page document and ignored examples 2 and 4 of the five examples. Example 2 specifically states exactly what a title company could do to be in compliance. Example 4 spells out exactly what an entity ought not do and it's exactly what Wells did. So there's no lack of specificity. But I believe directly to your question, the obligation is to enforce the policy and intent and purpose of the statute and it's not so vague that the court can't do that. It was HUD's intent. I may agree with you that I actually think the statute, I guess I would say that's your problem. The statute is too clear. So initially you have this very strict rule which doesn't allow for shared ownership. They decide to create an exemption for shared ownership and that becomes a safe harbor. In writing that statutory safe harbor, they're showing an awareness of the sham problem. I mean, C is about making sure the only thing of value is received is not these kickbacks but a return on the ownership interest. So what seems hard to me, if you take the policy statement out of the equation, is they seem to fit under the statute, which is why I'm wondering if the policy statement is an outcome dispositive of this case. Well, I would disagree in that the purpose of the statute is to prevent this type of sham, this type of unnecessary fees being paid. And there's an inherent conflict within 2607 between C2 and C4. C2 says you have to be doing real and actual services. C4 provides a safe harbor. Those two are ambiguous if read together and I think that's why HUD issued the policy statements. And HUD issued the policy statements because they saw, thanks to the Mortgage Brokers Association, that there was a real problem with entities collecting fees that they had not earned. And that is the real gravamen of the claim, is that there's a real question of fact of whether these entities are complying with the statute. And the HUD policy statement really gives us guidance and gives very clear and specific guidance, particularly if you look at the examples and not simply parse out certain phrases in the process. I realize I'm almost out of time. I don't know if the court wants me to go any further. I am out of time. Thank you, counsel. And we have reserved your two minutes for rebuttal. Thank you. Ms. Cole? Yes. Good afternoon. May it please the court, I'm Christine Cole with the Department of Justice for rebuttal. I guess I'll start by addressing the two questions that Judge Sutton just raised. The first is why didn't HUD undertake notice and comment rulemaking? The answer to that, and it's explained in the policy statement itself, or at least alluded to on page 29261, the agency didn't have to. The Real Estate Settlement Procedures Act specifically, Section 2617A, is quite broad in the authority that Congress has vested in the agency. It gives it not only authority to issue rules and regulations pursuant to rulemaking, but it also explicitly authorizes the agency to issue whatever interpretations that the agency thinks are necessary in order to carry out the purposes of the statute. But can I stop you there? This is Judge Sutton again. I'm just not familiar with the concept of something being authoritative, and I guess I will agree with you for the sake of argument that the provision you're referring to allows them to adopt authoritative, we'll call them statements, that are not notice and comment ruling, are not adjudicative decisions. But then to say they're not, you know, the agency's not committed to them, which is to say they're not, it's not just, they're just not binding, seems very strange to then say they're binding on the courts. I will agree with you that it is strange, and perhaps our briefs didn't make clear that what the policy statement does is really two things. The first part of it, and the essential part of it, is it is interpreting the phrase provider of settlement services in the statutory definition of affiliated business arrangements, and that's in Section 2602, subsection 7. And what the agency is saying in that respect is that a provider of settlement services has to be bona fide, not a sham. So in other words, what the agency did here was make explicit what is surely implicit in the statute, because after all, this is a consumer protection statute, and the purposes of the statute are quite clearly stated in Section 2601. What do you mean when you say it's not binding? Maybe that would help. Okay, and that, Your Honor, goes to the second part of the policy statement, and those are the ten factors or ten inquiries that the policy statement sets forth, along with the five concrete examples of how this would play out. What that part of the policy statement does is provide a framework of analysis so that either HUD and its enforcement responsibilities or a court can use that framework to determine whether or not there is a bona fide provider of settlement service. Okay, so the key thing you just said is a court can use, which is that's outside Chevron. I mean, that's at no skid more. The whole point of Chevron is that it binds courts. And Chevron applies here to the actual interpretation of the words provider of settlement service. In other words, the agency's statement that that must be a provision and not a sham. The agency is directly interpreting the statute there pursuant to its authority. Where is that argument in your brief? It's all throughout. As I said, it's not stated perhaps as clearly as it should have been, but we certainly stated numerous... Maybe an agency can interpret your brief and come up with a reg that that's what it meant. Well, no, I don't think it's quite like that. I think there are plenty of places throughout the brief. I can't put my fingers on them right this minute where we make it clear that the agency is interpreting that section of the statute itself. But when we talk about the part that's not directly binding, it's that framework for analysis. In other words, the whole point of policy statements and those kind of factors is to give a decision maker the flexibility that it needs because this is a very fact-specific inquiry regardless of whether you're talking about a settlement service provider or any entity where a question arises as to whether or not it's a legitimate bona fide entity or whether it's some sham or shell that's been created to avoid a statutory prohibition. There's nothing really unusual about that. In fact, we cite a couple cases from this court in our brief where the court has recognized that it's entirely appropriate for a decision maker to inquire into the bona fides of a particular entity that's subject to regulation. So that's what the policy statement does and that is in fact binding and it's entitled to Chevron deference. Can I again make sure I'm grasping this? So if the basic way you're thinking about this is you've got the statute, you've got this reference to this phrase, no regs, but then you have a policy statement that says this prevents shams and it's that part of it, that where Chevron applies and that would be binding on the court and then what binds the court about the rest of the policy statement, the ten-factor test, is our deference because that's interpreting the reg, well it's not a reg, but interpreting the other part of the policy statement. Is that the steps of the analysis? It's not. The ten factors plus the five examples are not so much interpreting something. They're providing a framework for analysis. It's guidance. I know, but you're saying it's binding on the court. I'm trying to understand, I'm actually trying to help you here. I'm trying to understand the theory that would make that last part of this binding on us because that's the whole point of Chevron. Well again, Your Honor, and I'm trying to be clear and I apologize if I'm not, the binding part is that some analysis must be undertaken to determine whether or not the provider of the benefit is bona fide. We don't have to follow the ten-factor test, though. The ten-factor tests are there to help the agency and to provide the public with information as to what factors should be considered. And when you look at those ten factors and the examples, they're the typical sort of things that would go into any inquiry as to whether or not an entity is bona fide or not. It looks at its independence, its capitalization, its office arrangement, its employees, and these are the very things that the agency, the kind of guidance that the agency was asked to provide by the mortgage industry and others. Now here we have, in this case, a situation where the district court completely disregarded not only the ten factors and the five examples that went along with them, but also the actual interpretation of the agency that the provider of settlement services must, in fact, be a bona fide operation and not some sham for avoiding the prohibitions of the statute itself. The court threw that out entirely and said it didn't make any inquiry into the bona fide operation. Instead, it simply said it provided a service, it satisfies the three criteria in the other provision of the statute, the safe harbor provision, and that's the end of it, and declared the policy statement unconstitutionally vague, and that's a dramatic... Counsel, can I ask you a question? I just want to make sure I'm following your position. I'm going to say this, not argumentatively, but just to try to make sure I'm getting it. If I'm getting it, you're saying there's a sham inquiry which is binding on the courts. Maybe it's directly binding from the statute, or maybe it's binding because of part of the policy statement. So that's part of what you're saying. And then the second thing you're saying is also part of the policy statement are these guidance for the department, but I don't hear you to be saying those are binding on us, the courts, in determining whether there's a sham. So if I've got the framework right, how do you deal with what I perceive as this problem? Let's say you're right. We do have to investigate whether there's a sham, but what I'm struggling with is why I don't do that through the vehicle of 2607C4C. I mean, that's a way to get at sham. Is there a thing of value? And as long as you've met that and the other parts of the safe harbor, you've dealt with the sham problem as Congress articulated it. So how would you respond to both my framing question and that specific question? Your Honor, I apologize for interrupting. This is Derek Diaz, counsel for the appellees. Judge Batchelder, we couldn't hear anything beginning now until Judge Sutton just spoke. Okay. Yeah. So Mr. Diaz, it sounds like you've got a bit of an update. So the way we're going to proceed is, I think as was suggested earlier, is finish the argument. The Department of Justice will finish answering that question. Then it'll be your turn. Then it'll be rebuttal. You'll get a chance after the argument to hear the whole argument. And if there's something that came up earlier, you'll have a chance, you know, within 10 days to file a supplemental response. And of course, if it triggers a response from the others, that's their game. I would say if I were in your position as an advocate, these would be the key moments of what was going on before you came on. Number one, not a single judge asked anything about void for vagueness. Most of the appellant's arguments related to the statute and the goal of not allowing sham entities and sham transactions. So it was a fair bit of discussion about that. And the questioning to date has related exclusively to administrative law issues and particularly Chevron Skidmore deference issues. And what I'm going to say now is a summarizing question that I just put to the Department of Justice lawyer, which I'm going to let her finish answering and then you'll be able to hear the question itself. So if I'm understanding the Department of Justice's position, there aren't any applicable regulations construing the statute and particularly this phrase affiliated business arrangements. But you have a policy statement. And as I'm understanding the Department's position, one part of that policy statement is binding on the courts, not just out there to give notice, but binding on the courts. And that's that the statute prohibits sham transactions. Then the question I was putting to the Department of Justice lawyer is you then have the rest of the policy statement, which has this ten-factor test and these examples. And the question is whether that is binding on the courts or some form of Skidmore deference or just something we can consult. Now the specific question was if we assume the Department of Justice is right that we have to take it as a given that the statute together with policy statement means that sham transactions are prohibited, why does the court have to look at these ten statements as opposed to the court looking at the statute itself where it seems to be implementing one of the ways you would have what we could call a sham transaction, and that is 2607C4C, this thing of value point, which obviously if you're not getting things of value, that's getting to a sham problem. So I guess, Ms. Cole, I can't even remember what part of this you answered, but why don't you try to answer that? Yes, Your Honor. The policy statement is addressed to the predicate issue as to whether or not there's a bona fide provider. The three conditions that you refer to that are in the statutory provision that provides the safe harbor, that's a different provision, that's the 2607C4 part, those are different conditions as the policy statement itself explains. You don't even get to those issues until you've got an arrangement that satisfies the affiliated business arrangement definition, which is in 2602, and as part of that inquiry, it's necessary to determine whether the words provider and settlement service in that definition, does that mean just anybody who provides something, or does it mean what the agency necessarily thinks it must be given the purposes of the statute, and that is that it has to be a bona fide provider of settlement services. In other words, it's two separate kind of inquiries. You've got the three conditions that are required and ordered. But the thing I'm not understanding is the alleged sham entity did provide some services. I mean, once you show there was a provision of some services, it seems to me you've satisfied that part of the safe harbor. Well, that's where the government has a different reading and understanding of the statute, and that's the purpose of the policy statement. For example, HUD says in it that HUD has not functions it purports to provide. This is on page 29261. And then it goes on from that point to explain where the problems have arisen. The safe harbor provision was enacted in 1983, I believe, and over the next decade or so is when there were a lot of these new entities created that, you know, they create something that, well, maybe you do one minor settlement service, but in fact that entity is really set up to funnel illegal kickbacks in violation of the statutory prohibition. So this policy statement was specifically designed to address that particular problem, and it explains that on the page that I just gave you. And again, that's a different, that's a predicate inquiry. Okay. I think I understand that, and then I just have one real discreet question, and then I have no other questions because we do have to move on. But I take it the department's position, the agency's position on the rule of lenity point is that, and maybe you just say you think this is what BABBIT stands for, although this is pretty amazing to me, but the agency's position is that the definition of something that has criminal consequences, so I'll call it a criminal statute, it's criminal and civil, but the definition of, say, proceeds in a statute with civil and criminal applications can vary from one presidential administration to another. So the definition of what is a crime could vary from one presidential administration to another. And I take it your answer is yes. Well, I have to think about that. Our understanding, and I'll try to be brief because I understand the time situation, our understanding of cases such as Barber v. Thomas and BABBIT is that the rule of lenity can peacefully coexist with Chevron. In other words, a Chevron analysis is undertaken, and part of that analysis is that you have to have an agency that is specifically authorized to interpret a particular statute, and the interpretation has to be a reasonable one. But at the end of the day, if a court were to decide that that interpretation still doesn't resolve a grievous ambiguity in the statute that imposes criminal penalties, then the rule... Yeah, but you see, you're answering the easy part of it. Lenity's about two things, notice, and you're exactly right. A regulation can give the world notice, but you're not answering the second part of the lenity problem, which is that who's supposed to define crime? And I didn't think agencies got to define crime. Well, part, again, of Chevron, and we do address this in a footnote in our supplemental brief, that that part of the rule of lenity concern, that the legislature, not the courts, define the criminal prohibition, that's satisfied because the statute itself is what defines the prohibition. And in turn, Congress gives the agency in question the authority to flesh that out and provide further elaboration or clarification of it. So one president can define a crime differently from the president before because Congress wrote a statute with sufficient ambiguity with criminal application. That's the answer. Yes. Okay, thank you. But there's, you know, the court then has review and can determine that that's an unreasonable interpretation of the statute under Chevron. Thank you, Ms. Holt, and sorry for the interruption with regard to your presentation. Mr. Diaz. Yes, Your Honor. Can you hear me okay? I apologize. I'm talking through a speakerphone on a cell phone. Yes, we can, or at least I can. Can everyone else? Yes. Yes. Yes. Okay. May it please the court, Derek Diaz, on behalf of Chicago Title Insurance Company. With me in the room is Mr. Rich Carr, who represents the other appellees in this case, and I will be presenting for all the appellees with no split of time. The definitive roadmap for resolving the main questions currently before this court is provided in the U.S. Supreme Court's most recent pronouncement on RESPA Section 8 and a HUD interpretive policy statement. That case is Freeman v. Quicken Loans, Inc., which the Supreme Court decided in May of last year. In that, Justice Scalia wrote for a unanimous court in finding that plain language of RESPA controlled and that HUD's policy statement amounted to a palpable overreach. Now, the same factors that led the Supreme Court to recommend Freeman are present here. Mr. Diaz, can I ask you a question? Let's say everything that we have in the policy statement was done through notice and comment rulemaking. So you have basically two things in the regulations. You have a right that says, hey, sham transactions are prohibited, and here's how you identify sham transactions. Would you be in trouble at that point? No, Your Honor. The way the Supreme Court looked at it is the same way that this court should look at the situation before it, starting with the plain meaning of the statute and then even if there had been what you're saying, full compliance with the notice and whatnot, and then maybe they'd have a better argument on Chevron, but the Supreme Court didn't even get to Chevron in Freeman. They got to the plain language and they reaffirmed what we're advocating that this court do, and that is look to the dictionary definition of provide. The statute itself defines settlement services, so you go from there with the dictionary definition of provide, and as the Supreme Court reaffirmed, it is the normal usage that in the absence of contrary indication governs our interpretation of text. Mr. Diaz, this is Judge Garza, and I just want to ask you about your argument. It seems to me that the argument you're making then leads us to the inevitable conclusion that the safe harbor exception has vitiated any possibility of a sham entity being identified. So that means that when Congress passed the amendment in 1983, they really didn't know what they were doing because the legislative history, as cited in the policy statement, said that Congress did not intend to negate the purpose of Section 8 in passing the safe harbor amendment. Your Honor, I'm sorry. There's a little bit of lag, so I apologize if I was interrupting. The term sham entity was created by HUD in the policy statement. It's nowhere in the statute, so you can't start there in terms of what is the plain language, but if you look at Freeman, it deals with a similar situation, because in there the argument was, well, why wouldn't HUD have this authority to deal with a situation that they saw later? And what the Supreme Court said in Freeman was that at the time RESPA was passed in 1974, there was a separate directive to HUD specifically directing them to notify and recommend further legislation if needed. And based on that, the court said if it were true that HUD had the authority to do what it did with the other policy statement, then that additional recommendation would make no sense. And so here there's a similar situation, because when Congress passed the ABA safe harbor in 1983, it also included a separate section which specifically empowered HUD to convene administrative investigations, to issue subpoenas, and the purpose of it was to recommend additional legislation if needed. And the way to do that was with that new section. So HUD tried to do through a policy statement through the back door what Congress explicitly told it to do through the front door. Also, the idea of what a sham entity is, if you use the plain dictionary meaning of provide, and if the entity doesn't provide under the standard definition, then you have that protection there. Now, another aspect of Freeman that should help guide this decision is how the Supreme Court dealt with the idea of, I'll call it the slippery slope absurdity of how can a RESPA not have prevented an undivided, unearned fee? Wouldn't that be taking advantage of consumers and being contrary to the statutory purpose? And what Justice Scalia wrote for the court was that the particular statutory purpose in RESPA is a poor, is a worse, is a bad candidate than most for the expansion of a limited text by depositing of an unlimited purpose. And they reaffirmed the traditional notion that vague notions of statutory purpose provide no warrant for expanding RESPA's prohibition beyond the field to which it is unambiguously limited. Counsel, this Freeman argument I'm not totally grasping because that was just a step one Chevron case. It didn't have policy statements. What I think is harder about this case is it seems to me the agency would have authority to define provider of services. That's what's hard about this case, and they just didn't do it the normal route. They did it in a route that's not binding on them. That's the part that's odd about it, but if you map this case against Freeman, I would have thought the full court would agree that provider of services can be defined and probably I would think could be defined to deal with sham providers of services. Well, it couldn't do so in a way that's contrary to the plain language of the statute and contrary to the overall intent. I mean, recall, Your Honor, that Congress was dealing with a specific problem when it passed the ABA safe harbor, and it came up with a specific solution. Now, the idea that there's, okay, the agency can fill in a gap, but it can't create a gap. There's no gap here to fill. Congress created what it thought was a conclusive way for an ABA to comply with the safe harbor and get the protection of the statute. Well, I mean, the ABA says thing of value. They could define thing of value, right? I mean, that's not self-evident. You don't just pick up a dictionary and look at provider of services as a thing of value and say, ah, there's no room to maneuver here. I think all of these terms do have some room for definition. Well, I don't know that they would have it within the structure of what Congress intended, Your Honor. And that's the question of whether there was a gap or not, and we would submit that there's none. You know, what's important here is that the government hasn't contended that the term provider is ambiguous, and that's why it promulgated the ten-factor test. Instead, what the government has said is that it received complaints from various members of the real estate industry and promulgated it in response to those complaints. So there's no necessary inherently ambiguous nature of that term provider of settlement services that HUD says it acted on on those grounds. In terms of the rule of lenity, what we put in our brief and what the law shows is that if there's a grievous ambiguity, then that ambiguity should err on the side of the person who's trying to comply with it. And as a measure of grievous ambiguity here, this court can refer to its earlier decision in Bell-Mayer. And that decision found a municipal ordinance unconstitutionally vague based on the factor of how far an ice bubbling machine or how far ice could be cleared from a dock. And the standard was it was only one. It was either five feet or based on the reasonable determination of the officer. And this court found that that was unconstitutionally vague. Here, you have ten factors, many of which are subjective. So it is even all the more vague. The ten-part test relies on what the government calls a subjective balancing process. And it says the government tells us in the policy statement that it weighs the factors in light of the specific facts of each case. A response to any one factor may not be determinative of the assessment of HUD. And I assume that of a jury, too. So we don't know how many factors you have to comply with. Is it five out of ten? Is it nine out of ten? It could be two. So the overall problem is that no entity, no ABA can know in advance whether it complies with the ten-factor test. So here are some examples. Say, for instance, one of the factors is does the entity manage its own affairs? And here, the ABAs have separate managers who manage the day-to-day activities of their ABAs. They handle all the paperwork and whatnot. So we would say that they meet the test for managers. Well, the carters would say that, well, because those managers consult with the owners for big business decisions, like who to hire, when to move the office or whatnot, that they do not manage those entities. But you can't look to the ten-factor test for guidance on that. So even something like factor four, which is office space, the policy statement offers you two options. Either have your own office space or rent from one of your parent companies at a market rate. What we don't know is that are they equivalent? Is one better than the other? Now, what if you pay market rent, or let's say you pay slightly less than market rent, does that mean you don't comply at all, or does it mean that there's partial compliance? Or if you have, let's say you pay more than market rent, is that some sort of bonus credit that you could carry over to another factor? We don't know, and no one would know. How about factor nine, which is actively competing in the marketplace for business? The factor says you can ask whether the ABA receives or attempts to obtain business from third parties. So here, the ABAs have gone out. They have marketing budgets. They have websites. They advertise in the yellow pages. So they are obviously attempting to obtain business from third parties and would seem to comply, but would somebody subjectively deem that actively competing? We don't know. If you recall during the legislative history for the ABA safe harbor, Congress expressly considered whether to adopt a 20% limitation on the amount of referrals from parent entities, and they specifically declined to adopt that and felt that the better route to go was not only the three factors that are listed in the statute, but also empowering HUD to make additional recommendations for further legislation if the need arises. So the problem here you have in a practical manner is that no ABA could ever get summary judgment on complying with the ten-factor test, which is another way of saying that you can never know what the line of prohibited conduct is. Before the court is also the question of class certification. I don't believe that Mr. Murray went into that. Is that true? That's correct. Nonetheless, this court should affirm the district court's ruling on class certification. The district court found in accordance with this court's prior authority and with courts all over the country that the presence of statutory incentives can defeat the superiority of a class action. Also, the capability of government enforcement can defeat the superiority of class actions. And that's especially true here given that there's a strong argument that Congress didn't even intend class actions for RESPA Section 8 because it specifically listed the ability to have class actions in RESPA Section 5, but didn't include them in 8. One could infer that Congress, had it wanted to allow class actions for RESPA Section 8, it easily could have done so. Again, the question before this court is not whether a different judge or even this panel would have reached a different decision on superiority or class certification, but rather whether the district court had the discretion to reach the decision he did. In addition to superiority, the district court found that common issues would not predominate over individual issues, specifically with respect to determining whether a mortgage was a federally related mortgage and also an individualized determination of damages was necessary because the ABAs would be entitled to payment for services, a reasonable payment for services actually rendered under the statute. So, in closing, the same factors that led the Supreme Court and Freeman to give the policy statement no effect are present here and should therefore lead to the same result. Furthermore, the district court did not abuse its discretion in denying class certification. Accordingly, the judgment of the lower court should be affirmed. Thank you, Mr. Diaz. A rebuttal? Mr. Murray? Thank you, Your Honor. Mr. Diaz referred to the number one rule of interpreting a statute and that is the plain meaning of the statute. The second part of that, though, is to carry out the stated purpose of the statute and the appellee's interpretation would make it possible for a SHAM entity to do practically no services, which is clearly the stated purpose of the statute it's attempting to prevent. And, in fact, it did happen in just that way and that's why the policy statement interpreting the statute was rendered by HUD in 1996 to stop the very wrong that's attempting to be prevented by the Act of Congress. Now, it's true the statute does not use the term SHAM, but it does indicate that you only get fees if you're doing bona fide services in real estate settlements. Wait, wait, wait. Where does bona fide, you're saying bona fide statute on this issue? Well, it's in C2, Your Honor. Yeah, that's bona fide salary. I didn't think this was a bona fide salary case. Well, I think it's bona fide. I think the fact is it's the compensation issue that you're receiving without benefit. And under those, I think it's under 2602, I believe, also the term bona fide is used, if I remember correctly. But, in any event, that is the purpose of the statute, is to make sure that you are actually doing something of value as compared to simply doing a referral. Can I ask you as a matter of statutory interpretation, if I don't think bona fide is in 2602, at least I'm not seeing it and part of it attached to the government brief. Maybe I'm missing something, but I'm not seeing it there. But why isn't it hurtful to you that in C2, they know how to use the word bona fide, and they use it only in the context of salary or compensation? Well, I think the government spoke to that, and we agree with that, that there's a layer of first you must determine whether or not there's actually services being performed and whether you're a, in my term then, bona fide entity as compared to someone who's simply getting paid for referrals. But I thought everyone agreed in this case there were some services provided. Well, I think that's what the whole purpose of the complaint from the Mortgage Brokers Association and the HUD policy statement is that there were basically some services being provided, but it's part of a sham operation in order to evade the prescriptions of the statute. Or to comply with the statute. Yes. To address your point, Judge Sutton, about the lineage, I do think that the agency does have the authority from administration to administration to provide further guidance from time to time. And if there was a criminal violation prior to 1996 without guidance from HUD, then I think that that would be problematic. But here, anything after 1996, it's in our position that it's very clear and not vague in any way, shape, or form if you look at the entire policy statement as to what Congress intended and what is a violation of statute. It just seems strange to me that given that Congress defines crime and not courts or Congress and not agencies, it just seems funny to me that from one administration to the next, the definition of a crime could change. That just seems really odd. Counsel, your two minutes for rebuttal are up, so you may briefly answer that question. Okay. I think that's what Congress intended when they authorized both rulemaking and interpretation of HUD to do this. Okay. Thanks. Thank you. Ms. Cole? Thank you, Your Honor. I just want to make a few quick points. First of all, the Freeman decision by the Supreme Court has absolutely nothing to do with this case. It involved a different provision of RESPA. And as the Court noted, the Court never even considered the policy statement there, which was a totally different policy statement. The second point is Appley's argument essentially boils down to this, that a sham operation is perfectly okay. And, in fact, one of the amici supporting the Appley's actually says that, and it's brief, and that would be the American Escrow Association, says neither the statute nor the regulations impose or define a requirement that a settlement service provider be bona fide. That's quite a statement to make, and it's totally contrary to Congress's intent. As Judge Barzilay pointed out, when Congress created the safe harbor for ABAs back in 1983, it specifically said there is no intent to repeal the prohibitions against things like kickbacks and unlawful referral fees. So the notion that it would be okay to come up with some creative arrangement that could get around those prohibitions is totally contrary to both Congress's intent as well as the purposes of the statute. And so for that reason, there's no further legislation that was needed for the agency to step up and respond to these various complaints and requests for further clarification that the provider of settlement services referred to in the statutory definition of an ABA needs to be a bona fide one. So, again, what the agency has done here is make explicit what is surely implicit in the statute. There's also no bright line requirement that has ever been necessary in order for a statute or regulation to pass constitutional muster. The court, both this court and the Supreme Court, have repeatedly stated that that level of specificity that the district court here would require is simply not necessary for due process concerns. Where's a case where Chevron deference is applied by the court but yet the agency doesn't find the guidance it's given binding on it? Or, in other words, it doesn't commit to it itself as binding on it? Well, again, this goes back to my original argument, and I think we do talk about this on pages 30 to 31 of our opening brief. What the agency was interpreting was this provision provider of settlement services, and obviously it was ambiguous because there were a lot of complaints about these sham operations that were being created. So that's why the agency stepped up and decided to issue a formal statement, and it's authoritative under the agency's regulations. It makes it clear in 24 CFR 3500.4 that the agency can speak through policy statements and to formally interpret the statute. So the binding part of this is the part that says that a provider must be bona fide and not a sham operation. The rest of the policy statement, the ten factors and the five concrete examples, that's there to provide the framework for analysis to determine whether something is bona fide or not. As to that part of it, if it's not binding, how can it bind courts? That's just my only question. If you say, well, no, that just gets Skidmore, then I get it. I'm sorry, Your Honor. It's not binding on the courts in the sense it's intended to give whatever the decision-maker is, be it HUD or be it a court, the flexibility because these are very fact-specific determinations. That's another way of saying Skidmore. Well, sure, and our brief does make the point that if the court determines Chevron deference isn't appropriate for that part of the policy statement, then Skidmore. But what the district court here did was not only complete... Ms. Cole, I don't want to hear about the district court. I just want to make sure I'm getting... I understand it's a backup argument that Skidmore applies if Chevron doesn't apply, but I still don't understand... I can't understand if your position is that Chevron does apply to those 10 statements or it doesn't. Is it a yes or no to that? It does not apply to the 10. Okay, good. It's a framework of analysis. It's not quite the same thing as an interpretation. The interpretation that is entitled to Chevron deference is the fundamental question or issue as to whether or not the provider of settlement services should be bona fide or a sham. Thank you, counsel. Thank you. The case will be submitted. Counsel may all depart the scene, and the judges should be put into conference. Hey, Judge, before... I know you have to go really quick. I'm hoping everyone's still on the line. Just real quick so I can confirm. Attorneys, I'm going to call you back. As soon as I get the computer down to IT, I will have them load the recording on our website, and I'm going to call you and let you all know when that is complete. And then I believe you gave Mr. Diaz 10 days to respond if he needs to, to argument. Yes. Mr. Diaz, are you still there? Yes, ma'am. Okay, so you know that. And then if he does file a response, how long, Judge Batcher, then for Mr. Murray and Ms. Cole if they need to do a response? I wouldn't think they would need more than 5 days. I can't really imagine that there's much that needs to come. Okay. I just wanted to confirm everything before we all disconnect. Fine. Okay. Drew, Judge Batcher, just wait, and we'll confirm. Attorneys, you may hang up at this time. I'll be calling you back shortly. Okay. Law clerks for Judge Barzilay, you may disconnect unless Judge Barzilay, you need the same thing to them really quick. I'll call you back later, guys. Okay. Goodbye. Thank you. Okay. And then, Judge Batchelder, I will disconnect.